**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **STEVEN P. LARSON** )<br>)<br>Petitioner, )<br>)<br>v. )<br>)<br>**WESTLAKE VINYLS, INC.** )<br>)<br>Respondent. )<br>) | Civil Action No. AW-07-421 |

**MEMORANDUM OPINION**

On March 7, 2007, the Honorable Alexander Williams, Jr. referred this case to the undersigned in accordance with 28 U.S.C. § 636 to resolve all discovery disputes. *See* Document No. 4. Pending and ready for disposition is Petitioner's Motion to Quash Subpoena (Document No. 1). Respondent filed a Response (Document No. 7) and Petitioner a Reply (Document No. 16). No hearing is deemed necessary. *See* Local Rule 105.6 (D. Md. 2004). For the reasons stated below, Petitioner's Motion to Quash Subpoena will be granted.

**BACKGROUND**

On January 22, 2007, Respondent Westlake Vinyls, Inc. ("Westlake") served a subpoena from this Judicial District to Petitioner Steven P. Larson ("Larson"), commanding Larson to appear for a deposition on March 1, 2007 at 9:00 a.m. regarding the case of *Westlake Vinyls, Inc. v. Goodrich Corporation*, *et al.*[1], 5:03-CV-00240-TBR, currently pending in the United States District Court for the Western District of Kentucky, Paducah Division (the "Kentucky

---

[1] Goodrich Corporation is the Defendant and Third Party Plaintiff in this litigation. Polyone Corporation is the Third Party Defendant.

1

Litigation"). *See* Document No. 1, Ex. A; Document No. 7, Ex. 8. In a separate litigation before the Summit County Court of Common Pleas in the State of Ohio (the "Ohio Litigation"), styled *Goodrich Corporation fka B.F. Goodrich Co. v. Commercial Union Co., et al.*, CV-99-02-0410, Goodrich Corporation ("Goodrich") retained Larson, a groundwater hydrologist, as an expert witness to testify against Goodrich's excess insurers. In that Ohio Litigation Goodrich sued its excess insurers "seeking defense, indemnity, and declaratory relief in regard to Goodrich's environmental clean-up liabilities or potential liabilities at the Calvert City plant." Document No. 1, at 2. Goodrich sought indemnification pursuant to a Part B post-closure permit issued to Goodrich under the Resource Conservation and Recovery Act ("RCRA") as well as a consent decree entered into with the State of Kentucky under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). Goodrich is the only permittee for the RCRA permit and the only potentially responsible party liable under the CERCLA consent decree. Document No. 16, at 3. "Because Goodrich bears all of the *legal* responsibility for remediation of the EDC[2] contamination at the [Calvert City plant (the "Site")], its insurers are required to indemnify it for all sums it incurred in remediating, regardless of who caused the contamination." *Id.* In January 2007, the Ohio court entered a judgment in the amount of $20 million in favor of Goodrich requiring Goodrich's insurers to pay for past and future remediation costs at the Site. *See* Document No. 7, at 2; Ex. 3.

The Kentucky Litigation, brought by Westlake, concerns which of the three parties (Westlake, Goodrich or PolyOne Corporation[3]) should be responsible for cleaning up soil and

---

[2] Ethylene-dichloride.

[3] This Third Party Defendant, in part, consists of a former division of Goodrich. *See* Document No. 1, at 2.

groundwater contamination at the Site. Goodrich owned and operated the plant for four decades. Over two transactions in 1990 and 1997 Goodrich sold the Calvert City plant to Westlake. Per a contractual provision between Goodrich and Westlake, Goodrich assumed the responsibility of paying for the clean up of contamination caused before 1990 and Westlake assumed financial responsibility for any post-1990 contamination. *See* Document No. 7, at 1-2. Although Goodrich remained solely responsible for any environmental liabilities at the Calvert City plant, when Goodrich sold portions of the plant to Westlake in 1990 and 1997, Westlake agreed to indemnify Goodrich against liability resulting from "'damage to any property or remediation of any soil, surface water and/or groundwater' caused by Westlake after the date of each sale." *Id.* at 4.

Both Westlake and Goodrich have retained experts who have formed opinions regarding which party caused the contamination at the Calvert City plant. It is undisputed that Larson is a non-party to the Kentucky Litigation.

## **DISCUSSION**

*A.   Standard of Review*

Federal Rule of Civil Procedure 45 establishes the rules for serving subpoenas on non-parties. Upon the filing of a motion, this Court has the authority to quash or modify subpoenas issued from this Court. Fed. R. Civ. P. 45(c)(3)(A), (B).

*B.   Larson's Status in the Kentucky Litigation*

*1.   A Retained, Non-Testifying Expert Under Rule 26(b)(4)(B)?*

Westlake argues that Larson's opinions, articulated in the Ohio Litigation, are relevant to the Kentucy Litigation and thus discoverable pursuant to Rules 26(b)(1) and 45(c)(3)(B)(ii).

3

Rule 26(b)(1) stands for the principle that non-privileged matter relevant to a party's claims or defenses is discoverable. Rule 45(c)(3)(B)(ii) concerns the protection of intellectual property of non-party witnesses, specifically, unretained experts. Westlake readily concedes that Rule 26(b)(4)(B), regarding the discovery of facts known or opinions held by non-testifying experts, does not apply to its proposed deposition of Larson. *See* Document No. 7, at 11. Although Larson argues he should be considered an unretained expert under Rule 45(c)(3)(B)(ii), in the alternative, Larson claims he should be considered a retained, non-testifying expert subject to Rule 26(b)(4)(B). *See* Document No. 1, at 7.

It is undisputed that Larson is not testifying in the Kentucky Litigation. It is further undisputed that Goodrich has not retained or specially employed Larson in anticipation of the Kentucky Litigation. It is uncontested that Goodrich retained Larson for the Ohio Litigation. *See* Document No. 1, at 4; Document No. 7, at 2. Although Westlake argues Larson is a testifying expert, *see* Document No. 7, at 11, Westlake is well aware that Larson testified in the Ohio Litigation *only*. Under these circumstances, the Court finds Larson is *not* a retained, non-testifying expert subject to Rule 26(b)(4)(B) with regard to the Kentucky Litigation. Alternatively, even if Rule 26(b)(4)(B) applied to Larson "to shield an expert's opinions about the specific case they are retained for or any closely related litigation[,]" *Bio-Technology General Corp. v. Novo Nordisk A/S*, No. 02-235-SLR, 2003 U.S. Dist. LEXIS 7911, at *4 (D. Del. May 7, 2003) (footnote omitted), this "protection" is moot because Larson's expert report, deposition testimony, trial testimony, his expert disclosures as well as the data and information underlying his opinions have been disclosed to Westlake. Document No. 16, at 9, 16.

*2.    An Unretained Expert Under Rule 45(c)(3)(B)(ii)?*

This Court has the authority to quash Westlake's subpoena pursuant to Rule 45(c)(3)(B)(ii).

> If a subpoena . . . requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party . . . the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

Westlake contends Rule 45(c)(3)(B)(ii) does not apply because (a) Larson's opinions describe events disputed in the Kentucky Litigation and (b) Larson's opinions were formed at the request of Goodrich, a party to the litigation. Document No. 7, at 7. Larson acknowledges that his circumstances do not completely fall within the rule by asserting "he is *most analogous* to an unretained expert under Rule 45(c)(3)(B)(ii)." Document No. 16, at 7 (emphasis added).

For the reasons stated *infra* the Court finds that Larson's testimony in the Ohio Litigation *did not concern* which entities are responsible for the contamination at the Calvert City plant and thus, contrary to Westlake's assertion, Larson's opinions do not describe matters disputed in the Kentucky Litigation. It is however undisputed that Larson's opinions were formed at the request of Goodrich, a party to the Kentucky Litigation. The Court has not located any cases addressing Rule 45(c)(3)(B)(ii) where an unretained expert, on behalf of a party to the litigation, had formed opinions, not concerning the current litigation, but for a previous litigation. *See Bio-Technology General Corp.*, 2003 U.S. Dist. LEXIS 7911, at *7 (plaintiff seeking to depose expert about facts and opinions developed for a previous litigation involving Genentech, not a party to the present case); *Schering Corp. v. Amgen, Inc.*, Nos. 98-97 MMS, 98-98 MMS, 1998 U.S. Dist. LEXIS

13452, at *7 (D. Del. Aug. 4, 1998) ("[N]either Dr. Simon's or Dr. Ju's testimony resulted from the expert's study made at the request of either Schering/Biogen or Amgen, but on the request of Genentech/Hoffman-La Roche, who is not a party to this case."). The Court has already determined that Rule 26(b)(4)(B) does not apply to Larson. *See supra*. The Court finds Larson's status in the Kentucky Litigation is most analogous to Rule 45(c)(3)(B)(ii) and thus the Court applies this Rule to this dispute.

The purpose for enacting Rule 45(c)(3)(B)(ii) can be gleaned from the Advisory Committee Note.

> Clause (c)(3)(B)(ii) provides appropriate protection for the intellectual property of the non-party witness; it does not apply to the expert retained by a party, whose information is subject to the provisions of Rule 26(b)(4). A growing problem has been the use of subpoenas to compel the giving of evidence and information by unretained experts. Experts are not exempt from the duty to give evidence, even if they cannot be compelled to prepare themselves to give effective testimony, . . . but compulsion to give evidence may threaten the intellectual property of experts denied the opportunity to bargain for the value of their services. . . . Arguably the compulsion to testify can be regarded as a "taking" of intellectual property. The rule establishes the right of such persons to withhold their expertise, at least unless the party seeking it makes the kind of showing required for a conditional denial of a motion to quash as provided in the final sentence of subparagraph (c)(3)(B); that requirement is the same as that necessary to secure work product under Rule 26(b)(3) and gives assurance of reasonable compensation.

Larson is not asking this Court to quash the motion because it threatens a taking of intellectual property. Larson acknowledges Westlake possesses *all* of his opinions rendered in the Ohio Litigation, specifically, Larson's expert disclosures, expert report, deposition testimony, trial testimony and the data and materials Larson relied upon in reaching his opinions. Document No. 16, at 9. Larson is not asserting that Goodrich did not compensate him for the

opinions rendered in the Ohio Litigation. Rather, because he has not been retained by any party in the Kentucky Litigation as a consulting or testifying expert, has no firsthand knowledge of facts relevant to the Kentucky Litigation nor has formed any opinions relevant to the Kentucky Litigation, Larson asks that his motion to quash be granted. Document No. 1, at 2.

The Court's analysis does not end with determining whether there would be an uncompensated "taking" of an unretained expert's intellectual property. Whether to allow the compelled testimony of Larson as an unretained expert is within the discretion of this Court. *Arkwright Mut. Ins. Co. v. National Union Fire Ins. Co.*, 148 F.R.D. 552, 557 (S.D.W. Va. 1993); *Schering Corp.*, 1998 U.S. Dist. LEXIS 13452, at *8. Despite having access to *all* of Larson's opinions from the Ohio Litigation, Westlake argues Larson's testimony is highly relevant to the Kentucky Litigation. "Westlake is entitled to know why Mr. Larson believes that contamination Goodrich caused decades ago is still contaminating the Site today, to probe the documents he relied upon and the witnesses[4] he conferred with in reaching that conclusion, and to explore a host of other avenues of questioning which would could - - at the very least - - lead to the discovery of admissible evidence." Document No. 7, at 6-7.

In determining whether this Court should exercise its discretion and permit compelled testimony of an unretained expert, this Court considers the following factors: (1) "the degree to which the expert is being called because of his knowledge of facts relevant to the case rather

---

[4] Westlake asserts Larson interviewed a key witness, a former Goodrich employee, in formulating his opinions. Document No. 7, at 8 n.4. Westlake does not identify this former employee by name. In reviewing excerpts of Larson's trial testimony, he relied upon the testimony of Mr. Brodine and Mr. Orsborn. *Id.*, Ex. 4 (Tr. 2150:8-14). Larson is questioned repeatedly about Mr. Orsborn's testimony. The Court presumes this is the "key witness." From what the Court is able to glean from Larson's trial testimony, Mr. Orsborn testified either at a deposition and/or at trial. Westlake has not explained why it could not obtain the deposition and/or trial testimony of this "key witness."

7

than in order to give opinion testimony;" (2) "the difference between testifying to a previously formed or expressed opinion and forming a new one;" (3) the possibility that, for other reasons, the witness is a unique expert;" (4) "the extent to which the calling party is able to show the unlikelihood that any comparable witness will willingly testify;" and (5) "the degree to which the witness is able to show that he has been oppressed by having continually to testify[.]" *Kaufman v. Edelstein*, 539 F.2d 811, 822 (2d Cir. 1976). Before considering these factors, this Court needs to resolve the different viewpoints of Larson and Westlake regarding the issues in the Ohio Litigation and how closely related or unrelated those issues are to the Kentucky Litigation.

    *a.*  *Issues in the Kentucky Litigation versus the Ohio Litigation*

According to Westlake, the Ohio Litigation concerned the amount, source and timing of the contamination at the Calvert City plant. More specifically, through Larson's testimony, Goodrich was able to prove that the unremediated contamination disposed of at the Calvert City plant decades ago presently continues to contaminate the site, and further, that the individual sources of Goodrich's contamination are "indivisible." Document No. 7, at 2. Westlake claims Larson's trial testimony at the Ohio Litigation covered the period of 1959 to date, *i.e.*, December 29, 2005. *Id.* at 5 n.2. "[T]here can be no legitimate argument as to the relevance of Mr. Larson's opinions, as he offered opinions touching on the fundamental dispute in the Kentucky Litigation - - the extent and cause of contamination at the Site." *Id.* at 10.

Larson characterizes Westlake's descriptions of his testimony as misleading and inaccurate. Larson defines the critical issue as follows:

> At issue in that case, among other things, was whether Goodrich's EDC contamination was caused by sudden and accidental events, or whether it was caused entirely by gradual leaking or seepage of EDC into the groundwater at the Calvert City, Kentucky site. . . .

> Resolution of this issue was relevant to the Ohio Litigation, because many of Goodrich's pre-1986 insurance policies contained a pollution exclusion, which specifically excluded coverage for gradual events, but permitted coverage for sudden and accidental events.

Document No. 16, at 2.

Larson argues he was retained by Goodrich to provide his expert opinion with respect to the source points of the environmental contamination at the Site. Larson did not opine about who was responsible for the contamination. That issue was not relevant in the Ohio Litigation. Larson claims his opinions were formulated based on his review of historical data from the Calvert City plant and further claims he did not review any post-1991 documents. *Id.* at 3. According to Larson he considered historical data only which predated Westlake's known contamination. None of his testimony concerned Westlake or its activities at the Calvert City plant.

Larson concedes he opined about the contamination being "indivisible." Westlake however fails to explain properly the context of this testimony. Larson's testimony attempted to establish that the undifferentiated contamination came from multiple sources and some of those sources were sudden and accidental.

> Larson first testified that contamination at the Site during the period that he considered originated from several different sources (e.g. burn pits, ponds, operational areas, and landfills). Larson opined, however, that the available Site data from the late 1980s and early 1990s did not permit him to differentiate among those sources of contamination. In other words, Larson testified that, using the limited historical data he referenced, he was unable to differentiate between contamination that came from routine operations, the landfills, ponds, or burn pit areas and contamination that came from operational areas from fires, explosions, pipes rupturing, and the like.

*Id.* at 3-4 (citations omitted).

The Court has reviewed excerpts of Larson's trial testimony. It is apparent to the Court what the scope of Larson's testimony entailed. Larson was specifically questioned about companies, other than Goodrich, causing contamination at the Site.

> Q: Sir, you've made no effort in your analyses to identify any drips, leaks or spills regarding operations of any entity apart from Goodrich, have you?
>
> A: No, I have not.
>
> Q: You've made no effort to assess the extent of any groundwater recovery that's been caused by some other company other than Goodrich, have you?
>
> A: No, I've not.

Document No. 16, Ex. A (Tr. 2165:24 - 2166:8).

Larson was specifically questioned about Westlake's contribution to contamination at the Site.

> Q: Are you aware of [Mr. Orsborn's] testimony with regard to the contribution to contamination at the site from the acts or operations of Westlake?
>
> A: I don't recall it specifically, no.
>
> Q: So you're not aware that he testified that a significant amount of hazardous waste pollution at the site was from Westlake's operations?
>
> \* \* \*
>
> A: I believe I read it in his testimony.
>
> Q: You're not relying on that testimony?
>
> A: No.
>
> Q: And you've read in his testimony that a production supervisor of Westlake has admitted that there were leaking liquid EDC and

process wastewater going into the soil and groundwater there?

A: I vaguely recall something like that from his testimony, yes.

Q: And you're aware of Mr. Orsborn's testimony that Westlake continued to use sewers that they had known were leaking for many years?

A: Yes, I recall that.

Q: And you recall testimony from Mr. Orsborn about leaks – – releases of hazardous waste into soil and the groundwater through leaking storage tanks, sewers, and the sumps under Westlake's watch at the facility?

A: I don't recall that specifically, no.

Q: You have no reason to doubt that he so testified, do you?

A: I do not.

Q: Are you familiar with his testimony that a national engineering firm has determined that 45 percent of waste being treated in the C stripper at the site is attributable to Westlake?

A: I recall that testimony, yes.

Q: You're familiar with that testimony of Mr. Orsborn, but it doesn't impact any of the opinions that you supplied; is that your testimony?

A: Yes, that was my testimony.

Q: Now you are giving us opinions with regard to the timing and sources of contamination at the facility; that's a fair statement, isn't it?

A: Yes.

Q: But you're disregarding any time frame outside of the time frame that you iterated in stating your opinion; true?

A: Could you repeat that question? I'm not sure I understood.

11

>Q: Let's try this: With regard to your opinion in that respect, you're disregarding Westlake as a source of the contamination, notwithstanding the fact that you're giving us an opinion about sources of contamination.
>
>A: I did not examine those kinds of releases in my opinion.

Document No. 7, Ex. 4 (Tr. 2167:14-22, 25 - 2170:5).

Based on the above excerpts, the Court finds Larson opined about the sources of contamination at the Calvert City plant, not which entities are responsible for the contamination. Larson did not consider Westlake's contribution to the contamination. Although the Ohio Litigation and the Kentucky Litigation concern contamination at the Calvert City plant and are related because of this issue, the focus of each litigation is different. In the Ohio Litigation, "Goodrich sought a declaration that each of [the insurance carriers with whom Goodrich had held umbrella and excess liability policies] had a duty to defend and/or indemnify it against claims filed by the federal government under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") and the Resource Conservation and Recovery Act ("RCRA")." *B.F. Goodrich Co. v. Commercial Unions Ins.*, No. 20936, 2002 WL 31114948, at *1 (Ohio Ct. App. Sept. 25, 2002). In the Kentucky Litigation, which Westlake initiated, the key dispute is which entity caused the contamination at the Site.

### b. *The Kaufman Factors*

Having resolved the question about Larson's role in the Ohio Litigation, the Court now applies the five *Kaufman* factors to the facts of this case. First, the Court finds Westlake seeks to depose Larson, not based on his knowledge of facts relevant to the Kentucky Litigation, but to obtain opinion testimony. Westlake has copies of Larson's expert report, his deposition testimony and his trial testimony and thus knows full well Larson's opinions. Second, Westlake

acknowledges its examination of Larson would be radically different from the insurance carriers' examination in the Ohio Litigation. Document No. 7, at 10 n.5. Westlake notes that Larson "did not consider what impact Westlake's alleged releases at the Site would have on his opinions." *Id.* at 5 n.2. Westlake admits it seeks to depose Larson "in order to discover admissible evidence to assist the cross-examination of Goodrich's own experts and rebut their own opinions." *Id.* at 11. If deposed, Larson would be forming new opinions, *i.e.*, what Westlake's role is in the contamination and how the expert opinion of Dr. McBean[5] contradicts Larson's previous testimony, matters Larson clearly did not address during the Ohio Litigation. Thus, Westlake would not restrict its deposition to Larson's historical opinions given in the Ohio Litigation. Rather, Westlake would have Larson "analyze or re-analyze data and form a new opinion." *Anker v. G.D. Searle & Co.*, 126 F.R.D. 515, 520 (M.D.N.C. 1989). Third, the Court finds Larson is *not* a unique expert. Both Westlake and Goodrich have retained multiple experts for the Kentucky Litigation. Fourth, Westlake is unable to show an inability to retain comparable witnesses willing to testify, thus making Larson's deposition a necessity. "Westlake has already engaged its own testifying experts in the Kentucky Litigation who have opined on the extent and timing of Goodrich's contamination at the Site. Westlake's experts have already formed their opinions, disclosed their experts reports, and are in the midst of being deposed." Document No. 7, at 11. Fifth, it is the Court's understanding that this is the first time, since the Ohio Litigation, that a party has sought to depose Larson. Although it may be inconvenient to participate in a deposition, the Court finds Larson has not been oppressed by having to testify continually. *Kaufman*, 539 F.2d at 822. In summary, four of the five *Kaufman* factors weigh against

---

[5] Dr. McBean is a hydrologist retained as an expert witness by Goodrich for the Kentucky Litigation.

compelling Larson to appear for a deposition.

Westlake has not shown a substantial need to depose Larson. Westlake has retained several experts who have opined about the extent and timing of Goodrich's contamination. No undue hardship is imposed on Westlake by the quashing of the subpoena. Under the circumstances of this case, there is no basis for compelling Larson to provide testimony.

*C.      Waiver of Objection*

Westlake claims Larson's objection to the subpoena *ad testificandum* is untimely because Larson did not serve written objections within fourteen (14) days of receiving the subpoena. According to Westlake Larson made his objection twenty-nine (29) days after being served. Larson thus has waived his objection and the Court must deny Larson's motion to quash. Document No. 7, at 12.

Westlake's assertions are without merit. Rule 45(c)(2)(B) states, in pertinent part,

> [A] person commanded *to produce and permit inspection, copying, testing or sampling* may, within 14 days after service of the subpoena . . . serve upon the party or attorney designated in the subpoena written objections *to producing any or all of the designated materials*. . . .

Emphasis added.

Westlake served Larson with a subpoena *ad testificandum* **not** with a subpoena *duces tecum*. Thus, the 14 day rule to file an objection is inapplicable.

In accordance with Rule 45(c)(3)(A), "*[o]n timely motion*, the court by which a subpoena was issued shall quash or modify the subpoena. . . ." Emphasis added. Westlake served Larson the subpoena on January 22, 2007. Larson, a non-party to the Kentucky Litigation, filed a motion to quash subpoena with this Court on February 20, 2007, less than thirty days later, and

14

nine days before the scheduled deposition. The Court finds Larson timely moved to quash the subpoena.

For the above reasons, Larson's motion to quash subpoena will be granted. A separate Order shall be entered.

April 5, 2007                                                    /s/
_____                    _____
    Date                                                WILLIAM CONNELLY
                                            UNITED STATES MAGISTRATE JUDGE